UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| KIMBERLY CRIDER, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>UNIVERSITY OF TENNESSEE, KNOXVILLE, )<br>    Defendant. ) | No. 3:09-CV-214<br>(Phillips) |

## MEMORANDUM OPINION

Plaintiff, a Seventh Day Adventist, brings this case against the University of Tennessee pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging failure to accommodate her religious beliefs. Before the court is the University's motion for summary judgment. For the reasons discussed below, the University's motion is **GRANTED.**

**I. Background**

Plaintiff Kimberly Crider was hired by the University of Tennessee in May of 2008 as a Coordinator in the Programs Abroad Office (PAO) of the Center for International Education. One of Crider's job responsibilities was to monitor an emergency cell phone on a weekly basis, including some weekends, for students and faculty traveling abroad to call in the event of an emergency. On or about her third day of employment, Crider notified the University that she could not carry the emergency cell phone or fulfill any job-related

responsibilities from sundown Friday to sundown Saturday due to her observance of the Sabbath. The University explored possible accommodations with Crider and with her co-workers. The University determined that no reasonable accommodation could be fashioned, and the University terminated Crider on June 20, 2008. Crider filed the instant action against the University on May 15, 2009, alleging religious discrimination under Title VII and a variety of state claims. Crider voluntarily dismissed her claims arising under state law and her claim for punitive damages. Only the Title VII claim for failure to accommodate remains.

At the time of Crider's employment, the PAO employed three Coordinators. The Coordinators oversee all aspects of the University's study abroad program. They advise students in selecting a program that fits their interests, assist in the application process, address academic issues, and assist the students in all aspects of international travel such as procuring a passport and visa, monetary exchange and other financial matters, immunizations, and safety and security concerns. The Coordinators are assigned particular areas of the world as their areas of responsibility. These assignments are based on the Coordinators' areas of expertise and familiarity with the local language.

The Coordinators typically attend at least one "site visit" per year in order to increase their familiarity with study aborad programs. Site visits consist of a series of visits to study abroad programs in other countries. The site visits are ordinarily 10-14 days in length and frequently include activities scheduled for Friday nights and Saturdays. The site visits are usually scheduled by one or more of the host programs. The site visits often

include receptions and other social functions in the evenings, when coordinators cultivate relationships with peers in foreign programs. Coordinators also attend conferences held by organizations such as the National Association for Foreign Student Affairs. These conferences allow the Coordinators to remain abreast of issues pertaining to study abroad. Coordinators conduct campus outreach sessions, orientations and other similar events to inform students about opportunities available in the PAO. Some of these events take place on weekends.

Dr. Pia Wood was hired as Director of the Center in October 2007. Dr. Wood established an emergency-management protocol which included an emergency cell phone to be monitored 24 hours a day by the Coordinators. The emergency phone was activated in April 2008. The number for the phone was given to all students and faculty members traveling abroad so they would have a single point of contact at the University if an emergency arose at any time. According to the protocol established by the PAO, the Coordinator carrying the phone would handle the emergency if possible, and if not, that Coordinator would seek assistance from the Coordinator with responsibility for the area from which the call had originated. Because an emergency may require a Coordinator to access information in a student's file, the Coordinator who is monitoring the phone is required to remain in Knoxville while monitoring the emergency phone, including weekends. Dr. Wood required all Coordinators to participate equally in the phone rotation. A rotation was established among the Coordinators to carry the phone for seven-day intervals, usually from Monday morning to Monday morning.

PAO Coordinators Noah Rost, Alisa Meador and Heather Grigsby all testified that the emergency cell phone is a burden, particularly over weekends. They must keep the phone with them at all times and be available to answer it at all times. As a result, it limits their activities, and it prevents them from disengaging from the office over the weekend. Meador and Rost shared the phone rotation initially before Crider was assigned to the rotation on June 16, 2008.[1] Even when the Coordinators are not monitoring the emergency phone, they must remain accessible by phone so they can assist if an emergency arises in their area of responsibility.

Plaintiff began her employment with the University on May 15, 2008. On or about May 19, 2008, Crider told Dr. Wood, Coordinators Rost and Meador that she could not perform any work from sundown Friday to sundown Saturday, including participating in the emergency phone rotation. Dr. Wood directed Crider to Dr. Marva Rudolph, the Director of the University's Office of Equity and Diversity. Dr. Rudolph told Crider to request a religious accommodation in writing. Crider wrote two letters to Dr. Rudolph in which she stated her religious conflict and inability to work from sundown on Friday to sundown on Saturday, and requested a religious accommodation. Crider could not carry the emergency phone on her Sabbath, even if an emergency arose among the other PAO Coordinators. Crider's religious beliefs also prohibited her from traveling for work-related reasons on the Sabbath, and from participating in activities on site visits that occurred Friday evenings or Saturdays. Nor would her religious beliefs allow Crider to participate

---

[1] Heather Grigsby was hired at the Coordinator position in September 2008, after Crider was terminated from the University. At the time of Crider's employment, there were only two coordinators, Rost and Meador.

in activities during a professional conference, or campus outreach/orientation that occurred on Friday nights or Saturdays.

Dr. Wood met with Crider to explore the parameters of her work limitations to determine if an accommodation could be fashioned. Dr. Wood asked Crider if she would be willing to monitor the phone if the other Coordinators were out of town. Dr. Wood also asked Crider if she would monitor the phone if one Coordinator was out of town and the other Coordinator had a family crisis. Crider stated that she was unwilling to work on Friday nights or Saturdays under these circumstances. Dr. Wood concluded that the parties had reached an impasse. Dr. Rudolph also met with Crider in an attempt to explore accommodation possibilities. Crider refused to work on Friday nights or Saturdays. In a letter from Dr. Wood to Crider dated June 16, 2008, Dr. Wood characterized Crider's position on emergency-management response as follows:

> As you know, each PAO coordinator is the liaison for student exchanges and other study abroad programs in certain countries/regions of the world. The coordinator is responsible for understanding the details of each program, developing and maintaining contacts in the countries, advising students interested in the programs, etc. At the moment, you have been assigned Spain and Latin America. If an emergency/crisis occurs in one of the countries/regions where UTK students are studying abroad, the PAO coordinator for that country/region must be able to provide assistance in any way deemed necessary at any time (24/7). You have explained that you would not be able to help with any situation that occurs on Friday evening or Saturday. The University and the CIE would be remiss in their duty if they did not ensure that all persons holding the position of PAO coordinator are able and willing to assist 24/7 with a situation such as an overseas emergency/crisis involving UTK faculty, staff, or students.

5

Crider responded that she was willing to take on additional responsibilities to offset her inability to work on Friday nights and Saturdays. However, she reiterated that she would be unable to work Saturdays because of her religious beliefs.

Dr. Wood asked Rost and Meador if they would be willing to voluntarily monitor the emergency phone on alternating weekends on a permanent basis. Both Coordinators said no. Crider presented Dr. Wood with an alternate phone schedule which required Meador and Rost to carry the phone on alternating Saturdays and exchange the phone with Crider on Saturday nights. This proposed schedule still would have required Meador and Rost to participate in the phone rotation on alternating weekends. Under Crider's proposal, she would be responsible for the phone a majority of the days each month. Dr. Wood asked Meador and Rost if they would agree to Crider's proposal. Both said no. Meador's reasons for not agreeing to monitor the phone on alternating weekends were because she could not travel, and she found it a personal imposition to exchange the phone on Saturday nights. Rost explained that he did not want to monitor the phone on alternating weekends because he cared for two sets of elderly parents on weekends, and he would not be able to disengage from work.

Dr. Wood was unwilling to require Meador and Rost to permanently carry the emergency phone on alternating weekends for two reasons. First, she determined that a two-person rotation compromised the safety of students because Meador and Rost travel frequently for work and when one is traveling, the other would be responsible for the emergency phone with no backup in the event a personal emergency or family crises

arose. Second, she felt that it was an onerous burden to require them to carry the emergency phone on alternating weekends because it is a taxing responsibility and because person carrying the phone is unable to travel outside of Knoxville. Dr. Wood could not assign hourly staff members to the emergency phone rotation because they lacked the necessary training, expertise and authority to respond to an emergency. Moreover, adding emergency phone responsibilities to the staff members would have required the University to reclassify and restructure their job positions. Dr. Wood could not devise an accommodation that would have allowed Crider to refrain from working on Friday nights and Saturdays without shifting the emergency phone responsibility on at least part of every other weekend to Meador and Rost. Dr. Wood determined that she could devise no permanent accommodation for Crider that would not have compromised the PAO's risk-management program, particularly if emergencies arose in Latin America or Spain. Crider was the only Spanish speaking Coordinator and approximately 30% of the University's study abroad students travel to those areas.

Dr. Wood was also unable to devise a permanent accommodation that would have allowed Crider to fulfill her responsibilities with respect to site visits, conferences and other weekend events without at least some work or travel on Friday nights and Saturdays. Dr. Rudolph concluded that the parties had reached an impasse and that no reasonable accommodation could be reached given Crider's refusal to carry the emergency phone on Friday nights and Saturdays, the refusal of the other Coordinators to assume Crider's responsibilities indefinitely, and the lack of any other qualified employees to assume responsibility for the emergency phone. After concluding that Crider could not perform her

job duties consistent with her work limitations and that no reasonable accommodation could be reached, Dr. Wood made the decision to terminate Crider effective June 20, 2008. Dr. Rudolph and Alan Chesney, the University's Director of Human Resources, concurred with this decision. On June 19, 2008, Dr. Wood gave Crider notice that she was terminated effective June 20, 2008.

The PAO posted the vacant coordinator position following Crider's termination. The PAO hired Anne Hulse as a Coordinator. Hulse has Spanish speaking skills and has expertise in Spanish speaking countries. Upon completion of training in the emergency phone procedures and the PAO's emergency-management protocol, she began participating in the emergency phone rotation. In the late Summer of 2008, Dr. Wood received approval to restructure the PAO and hire a fourth Coordinator. Dr. Wood hired Heather Grigsby, a secretary in the PAO, for this position.

**II. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment**

Crider has moved the court to strike and summarily deny the University's motion for summary judgment on the grounds that the defendant's motion was untimely filed [Doc. 13]. In support of the motion, Crider points out that under the scheduling order entered in this case, the University was required to file any dispositive motions no later than 120 days before trial, in this case by December 13, 2010. However, the University did not file its motion for summary judgment until December 14, 2010, one day late.

Counsel for the University responds that when he calculated the deadline for dispositive motions to be filed, he inadvertently included the trial date, and this resulted in a deadline that was one day beyond the deadline set out in the court's scheduling order. Counsel also points out that Crider has identified no prejudice that she has experienced as a result of the motion being filed one day late. Therefore, the University asks the court to deny Crider's motion and accept the University's motion for summary judgment.

Federal Rule of Civil Procedure 6(b)(1) states that the court may extend the time required for an action. The Rule further states that if the required time for performing an act has already expired, the court may extend the time upon motion made by the party, "if the party failed to act because of excusable neglect." F.R.C.P. 6(b)(1)(B). The court finds that the University has shown that its mistake was inadvertent. Moreover, Crider has shown no prejudice resulting from the one day delay. The court prefers to resolve cases on their merits, and not on technicalities. Accordingly, Crider's motion to strike the University's motion for summary judgment is **DENIED.** The court will now proceed to address the merits of the University's motion for summary judgment.

### III. Summary Judgment Standard

Summary judgment is appropriate when a court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Matsushita Electric Indus. co. v. Zenith Radio*

*Corp.,*, 475 U.S. 574, 587 (1986); Fed.R.Civ.P. 56(c) (2008).  Once the party seeking summary judgment has properly filed evidence supporting its motion, or has asserted that there is an absence of evidence to support an essential element of the non-moving party's claim, the burden of production shifts to the non-moving party.  At this point in time, the non-moving party must do more than allege facts; instead, that party must set forth specific evidence illustrating genuine and material issues of fact for trial.  *See Celotex*, 477 U.S. at 322-24.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

A factual dispute is genuine only if the non-movant's evidence is substantial enough to require trial.  *Anderson*, 477 U.S. at 249-50; *Harris v. Metro. Gov't of Nashville and Davidson Co.,* 594 F.3d 476, 485 (6th Cir. 2010) ("A genuine issue of fact exists only when there is sufficient evidence on which the jury could reasonably find for the plaintiff").  A genuine dispute cannot be created by self-serving testimony when competent evidence to the contrary exists.  *See Burdette v. Fed. Express Corp.,* 367 Fed. Appx. 628, 633 (6th Cir. 2010) (holding plaintiff's testimony alone was insufficient to create a genuine issue of material fact for trial).

### IV.  Title VII Religious Accommodation Claim

Title VII of the Civil Rights Act of 1964, as amended in 1972, makes it unlawful for an employer to discriminate against an employee on the basis of religion.  42 U.S.C. § 2000e-2(a)(1).  Specifically, the statute provides that it is unlawful for an employer

"to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion ...." *Id.* The term "religion" as used within Title VII includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

"The obligation to accommodate includes efforts to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs." *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir. 1987). An employer may choose any reasonable accommodation in accommodating an employee's religious beliefs. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68 (1986). Even so, an employer need not sustain an undue hardship in accommodating an employee's religious beliefs and, in this context, "to require an employer to bear more than a *de minimis* cost to accommodate ... is an undue hardship." *Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1378 (6th Cir. 1994) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).

To succeed on this claim, Crider must establish a *prima facie* case of religious discrimination. *Smith*, 827 F.3d at 1085. This requires Crider to show that (1) she holds a sincere religious belief that conflicts with an employment requirement, (2) she has informed the employer about the conflict, and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id.* Once Crider establishes

a *prima facie* case, the burden shifts to the University "to prove that it cannot reasonably accommodate the employee without incurring undue hardship." *Id.*

For purposes of the present motion only, the University concedes that Crider has established a *prima facie* case of religious discrimination. With the *prima facie* case of discrimination established, the burden now shifts to the University to prove that it cannot reasonably accommodate Crider without incurring an undue hardship. As to this issue, the University argues that it could not have reasonably accommodated Crider's religious beliefs without incurring an undue hardship. Crider responds that the University neither made a reasonable effort to accommodate her religious beliefs nor is able to prove that it could not accommodate her religious beliefs without undue hardship. The court finds that Crider's arguments lack merit.

Generally, the reasonableness of an accommodation is determined on a case-by-case basis according to the facts as they existed at the time of the plaintiff's employment. *Cooper*, 15 F.3d at 1378-80. As previously indicated, though, "Title VII does not require an employer to bear more than a *de minimis* cost in accommodating an employee's religious beliefs." *Id.* at 1380. This means that an employer cannot be required, among other things, to hire an additional worker or risk production losses. *Id.* Additionally, an employer's accommodation of one employee's religious beliefs should not be at the expense of other employees. *Hardison*, 432 U.S. at 85 ("We will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath"); *see also Virts v. Consol. Freightways*

a *prima facie* case, the burden shifts to the University "to prove that it cannot reasonably accommodate the employee without incurring undue hardship." *Id.*

For purposes of the present motion only, the University concedes that Crider has established a *prima facie* case of religious discrimination. With the *prima facie* case of discrimination established, the burden now shifts to the University to prove that it cannot reasonably accommodate Crider without incurring an undue hardship. As to this issue, the University argues that it could not have reasonably accommodated Crider's religious beliefs without incurring an undue hardship. Crider responds that the University neither made a reasonable effort to accommodate her religious beliefs nor is able to prove that it could not accommodate her religious beliefs without undue hardship. The court finds that Crider's arguments lack merit.

Generally, the reasonableness of an accommodation is determined on a case-by-case basis according to the facts as they existed at the time of the plaintiff's employment. *Cooper*, 15 F.3d at 1378-80. As previously indicated, though, "Title VII does not require an employer to bear more than a *de minimis* cost in accommodating an employee's religious beliefs." *Id.* at 1380. This means that an employer cannot be required, among other things, to hire an additional worker or risk production losses. *Id.* Additionally, an employer's accommodation of one employee's religious beliefs should not be at the expense of other employees. *Hardison*, 432 U.S. at 85 ("We will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath"); *see also Virts v. Consol. Freightways*

*Corp. of Del.,* 285 F.3d 508, 521 (6th Cir. 2002). Under these guidelines, Crider's proposed accommodations in this case all result in undue hardships to the University.

Crider's religious beliefs conflicted with at least four work functions of a Coordinator: (1) participation in the emergency phone rotation that required the phone to be monitored on weekends; (2) participation in emergency management that may take place on weekends; (3) attendance on site visits that include weekend functions; and (4) assistance with campus outreach functions that occur on Friday nights and Saturdays. During the time of Crider's employment, the PAO employed three Coordinators. The Coordinators rotate responsibility for monitoring the emergency phone on a one-week basis, Monday morning to Monday morning. All Coordinators participate equally in the emergency phone rotation. When a Coordinator is monitoring the emergency phone, he or she must physically possess the phone and be available to answer it at all times. Because an emergency may require a Coordinator to access information in the office, the Coordinator who is monitoring the emergency phone must remain in Knoxville at all times, including weekends. The Coordinators have been trained in responding to emergencies, have the authority to respond to emergencies, and have expertise in the various programs around the world in which students participate.

Since the establishment of the emergency phone, the Coordinators have received calls about matters ranging from missed flights to swine flu concerns. On Saturday, February 27, 2010, an earthquake struck in Chile. At the time, a group of 70 University students were en route to Chile on a faculty-led trip. Rost heard about the

earthquake and called Hulse, the Coordinator with responsibility for Latin America. Rost and Hulse went to the office and spent the remainder of the day locating each of the students, ensuring that they were safe and making arrangements for them to return home. Along with Dr. Wood, they answered calls from University administrators and answered calls from the media. On Saturday, July 10, 2010, a Coordinator handled a call from a faculty member who was leading a student trip in France and called to report a sexual assault and to obtain advice about how to handle the situation.

Crider argues that Dr. Wood should have accommodated her by requiring Rost and Meador to monitor the emergency phone on alternating Saturdays. However, Rost and Meador were unwilling to voluntarily monitor the emergency phone on Friday nights and Saturdays during Crider's rotation in addition to their regular rotations. Both testified as to the limitations imposed when monitoring the emergency phone on weekends. They had been alternating weeks with the emergency phone while the PAO searched for a third Coordinator, and they told Dr. Wood they would not voluntarily cover Crider's Saturday phone responsibilities on a permanent, alternating basis on top of their own phone responsibilities. Title VII does not require an employer to reassign duties involuntarily in order to accommodate one employee's religious beliefs. *Hardison*, 432 U.S. at 81 (finding that under title VII, an undue burden is placed upon the employer if a proposed accommodation would force changes in the schedules of other employees, and alter the employer's otherwise neutral procedure). Federal courts have consistently followed *Hardison* and found that employers are not required to impose shift changes and job assignments on unwilling employees in order to accommodate other employees'

religious preferences. *See McGuire v. General Motors Corp.,* 956 F.2d 607 (6th Cir. 1992); *Prach v. Hollywood Supermarket, Inc.,* 2010 WL 3419461 (E.D.Mich. Aug 27, 2010); *Bruff v. North Miss. Health Servs.*, 244 F.3d 495 (5th Cir. 2001); *Weber v. Roadway Express, Inc.,* 199 F.3d 270 (5th Cir. 2000); *Eversley v. MBank Dallas,* 843 F.2d 172 (5TH Cir. 1988).

Moreover, the EEOC, in its interpretative regulations, does not include involuntary transfers among its list of possible accommodations. On the contrary, the regulations limit reasonable accommodations to circumstances "where a *voluntary* substitute with *substantially similar qualifications* is available." 29 C.F.R. § 1605.2(d)(i) (emphasis supplied). Therefore, the court finds it would have constituted an undue hardship on the University to require Meador and Rost to permanently monitor the emergency phone on alternating weekends in addition to their regular rotations.

As an alternative accommodation, Crider argues that Dr. Wood could have assigned a member of the PAO hourly support staff to monitor the phone during her Sabbath. As explained by the University, this is problematic for two reasons. First, only the Coordinators have sufficient expertise, training and authority to respond to any emergency calls. They are most familiar with the various study abroad programs, the placement of students, and the legal and cultural issues that may arise. They know where files are located in the PAO so they can assess them if required. They also have the authority to make quick decisions if needed to respond to an emergency. Dr. Wood testified that it would compromise the safety of students traveling abroad to entrust the emergency phone to an untrained staff member. Employers are not required to

15

accommodate an employee's religious beliefs by replacing them with an unqualified employee. *See Smith*, 827 F.2d at 1088 (recognizing one means of accommodation as allowing employee to trade shifts with a "qualified employee"); 29 C.F.R. § 1605.2(d)(i) ("Reasonable accommodation without undue hardship is generally possible where a voluntary substitute with substantially similar qualifications is available").

Second, the support staff members are hourly employees. Therefore, the requirement that they remain in Knoxville and monitor the emergency phone for 24 hours would have constituted work for which overtime compensation would have been required. Further, Dr. Wood testified it would have required the University to reclassify and restructure those positions, resulting in more than a *de minimis* cost to the University. *See DePriest v. Dept. of Human Servs.,* 830 F.2d 193 (table), 1987 WL 44454 (6th Cir. 1987) (payment of overtime would have imposed a substantial burden on employer).

Crider also argues that the PAO could have hired a fourth Coordinator to monitor the emergency phone while she observed her Sabbath. This would have exceeded a *de minimis* cost as well. Requiring an employer to bear more than *a de minimis* cost in order to accommodate an employee's religious beliefs is an undue hardship as a matter of law. *Goldmeier v. Allstate Ins. Co.,* 337 F.3d 629, 638 (6th Cir. 2003). Moreover, even though a fourth Coordinator was hired several months after Crider's termination, this was not the situation which existed when Crider was employed, and the University was under no legal obligation to incur the costs associated with the addition of even one employee to allow Crider to avoid all Saturday work. *See Cooper*, 15 F.3d at 1380.

16

The University has shown that it could not reasonably accommodate Crider's religious beliefs without incurring an undue hardship. Dr. Wood attempted to explore possible scenarios with both Crider and the other Coordinators in an attempt to clarify Crider's limitations and fashion an accommodation. She met with Crider and posed several scenarios in an effort to explore ways an accommodation might be reached. Dr. Wood asked Crider if she would be willing to carry the phone if the other Coordinators were out of town. She was not. Dr. Wood asked Crider if she would monitor the phone if one Coordinator was out of town and the other Coordinator had a family crisis. She would not. Dr. Wood asked Crider if she would be willing to assist in an emergency situation. Crider told Dr. Wood that she could not assist in an emergency during her Sabbath under any circumstances. Later, at her deposition in this case, Crider suggested that she could have assisted in a "life or death" emergency, but she never conveyed this information to the University during her employment. Therefore, at the time Dr. Wood was considering accommodations, she understood that Crider could not assist in any emergency that arose from sundown Friday to sundown Saturday.

Dr. Rudolph also met with Crider to explore possible accommodations, and Dr. Rudolph testified that Crider was unwavering in her refusal to work on Friday nights or Saturdays. "An employee has a duty to cooperate in achieving accommodation of his or her religious beliefs, and must be flexible in achieving that end." *Bruff*, 244 F.3d at 503. An employer's burden is discharged if it "can show that each and every accommodation would cause an undue burden." *EEC v. Texas Hydraulics*, 583 F.Supp.2d 904, 910 (E.D.Tenn. 2008). Crider concedes that every accommodation scenario would have

17

required Meador and Rost to work at least a portion of alternating weekends in addition to their regular turns in the rotation monitoring the emergency phone. The University has shown that such an accommodation would constitute an undue hardship. Therefore, there was no reasonable accommodation for the University to propose and its duty under Title VII was discharged as a matter of law.

The Coordinators have other weekend responsibilities that Crider could not perform based on the limitations imposed by her religious beliefs. Crider could not participate in any site visit functions that occurred on Friday nights or Saturdays. As pointed out by the University, this limitation could have been accommodated in only three ways: (1) send a second Coordinator on the site visit, at more than a *de minimis* cost; (2) allow Crider to skip the portions of the site visit that occurred during Friday nights and Saturdays, which would have resulted in missed opportunities to cultivate relationships and learn about exchange programs (the central functions of her job); or (3) allow her to forego site visits altogether, which would have compromised the University's availability of offerings to students in her areas of responsibility. All of these options constituted an undue hardship on the University, and are not reasonable accommodations as a matter of law.

In addition, the Coordinators participate regularly in campus outreach sessions at orientations and other similar events to inform students about opportunities available in PAO. Some of these events take place on weekends. Crider proposed that these responsibilities be delegated to the other Coordinators. Again, it was unfair to expect

the other Coordinators to shoulder her weekend responsibilities on a permanent basis. This would have resulted in more favorable treatment of Crider based solely on her religious beliefs. "Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities." *Virts*, 285 F.3d at 521 (quoting *Hardison*, 432 U.S. at 81)).

Crider argues that the University had an absolute duty to manufacture *some* accommodation for her even though all potential accommodations amounted to an undue hardship as a matter of law. Case law in the Sixth Circuit holds that an employer has no duty to accommodate an employee "where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation." *Smith*, 827 F.2d at 1085; *see also Texas* Hydraulics, 583 F.Supp.2d at 910 ("A refusal to accommodate is justified if an employer can show that each available method of accommodation would cause an undue burden"); *Weeden v. Frank,* 16 F.3d 1223 (table), 1994 WL 47137 (6th Cir. 1994) ("Where an employee will not ... cooperate with his employer in its conciliatory efforts, he may forego the right to have his beliefs accommodated by his employer"); *Cary v. Anheuser-Busch, Inc.,* 116 F.3d 472 (table), 1997 WL 342593 (4th Cir. 1997) ("Accommodation is not so onerous as to charge an employer with the responsibility for continually searching for each potential religious conflict of every employee"); *EEOC v. Townley Eng. & Mfg. Co.,* 859 F.2d 610, 615 (9th Cir.

1988) (employer is not required to engage in fruitless dialogue when it is clear that no accommodation could be made without undue hardship).

## V. Conclusion

Although Crider established a *prima facie* case of religious discrimination under Title VII, the University also met its burden of showing that it cannot reasonably accommodate Crider without incurring undue hardship. All proposed accommodations in this case would require the University to bear more than a *de minimis* cost or to discriminate against other employees on the basis of Crider's religious beliefs. Title VII imposes no such accommodation requirements. Accordingly, the University's motion for summary judgment [Doc. 10] is **GRANTED**, and this action is **DISMISSED.** A judgment consistent with this opinion shall issue.

**ENTER:**

s/ Thomas W. Phillips
United States District Judge