**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

|   |   |   |
|---|---|---|
| Leonard Green<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: July 23, 2012

Mr. Michael D. Fitzgerald
University of Tennessee
Office of General Counsel
719 Andy Holt Tower
Knoxville, TN 37923

Mr. Charles M. Kester
The Kester Law Firm
P.O. Box 184
Fayetteville, AR 72702

Mr. Brian A. Lapps Jr.
University of Tennessee
719 Andy Holt Tower
Knoxville,

Mr. Todd R. McFarland
General Conference of Seventh-Day Adventists
12501 Old Columbia Pike
Silver Spring, MD 20904

Ms. Jennifer Buchanan Morton
Law Office
8217 Pickens Gap Road
Knoxville, TN 37920

        Re: Case No. 11-5511, *Kimberly Crider v. University of Tennessee*
           Originating Case No. : 3:09-CV-214

Dear Sir or Madam,

The Court issued the enclosed (Order/Opinion) today in this case.

                                               Sincerely yours,

                                               s/Cheryl Borkowski
                                               Case Manager
                                               Direct Dial No. 513-564-7035

cc:  Ms. Debra Poplin

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0800n.06

No. 11-5511

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jul 23, 2012*
LEONARD GREEN, Clerk

| | |
|---|---|
| KIMBERLY CRIDER, | |
| Plaintiff-Appellant, | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
| v. | |
| UNIVERSITY OF TENNESSEE, KNOXVILLE, | |
| Defendant-Appellee. | OPINION |

Before: KEITH, MCKEAGUE, and DONALD, Circuit Judges.

DONALD, Circuit Judge. Plaintiff Kimberly Crider appeals the district court's grant of Defendant University of Tennessee, Knoxville's ("UTK") motion for summary judgement in Crider's religious discrimination suit brought pursuant to Title VII of the Civil Rights Act of 1964. For the following reasons, we reverse and remand.

I.

In May 2008, Crider was hired by UTK as a Programs Abroad Coordinator in the University's Programs Abroad Office ("PAO"). Crider's job responsibilities included attending conferences on behalf of the department, traveling internationally on "site visits," and monitoring an emergency cell phone on a rotating basis, including weekends.

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

The emergency phone was activated in April 2008 as a means by which students studying abroad could reach the PAO in the event of an emergency. Because a student's file might need to be accessed on such an occasion, the Coordinator with monitoring duties was required to stay in Knoxville at all times while in possession of the emergency phone. During the time Crider was employed by UTK, the PAO had three Coordinators. The Coordinators shared responsibility for carrying the emergency cell phone on a rotating basis. This responsibility included off-hours and weekends.

Four days after she began working for UTK, Crider informed Dr. Pia Wood, her supervisor, that she was a Seventh Day Adventist and that due to her religious beliefs she was not able to perform work related tasks from sundown on Fridays until sundown on Saturdays. Among the tasks that Crider was unable to perform was monitoring the emergency cell phone on Friday nights and Saturdays. Dr. Wood referred Crider to Dr. Marva Rudolph, Director of UTK's Office of Equity and Diversity. On May 20, 2008, Dr. Rudolph instructed Crider to put her request for a religious accommodation in writing, which she did. Dr. Rudolph then contacted Dr. Wood and Alan Chesney, UTK's Human Resources Director, stating that she did not think UTK was obligated to accommodate Crider but that they would explore possible accommodations as a proactive matter.

Despite her conversations with Drs. Wood and Rudolph, in June 2008 Crider learned that she was scheduled to carry the emergency phone on an upcoming Saturday. Crider then devised her own accommodation and presented Dr. Wood with a proposed voluntary shift exchange schedule. The proposed schedule reduced the number of total days the other two Coordinators were responsible for the phone while increasing the number of weekends they were required to carry it. Dr. Wood

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

presented Crider's proposal to the other two Coordinators, Noah Rost and Alisa Meador, and inquired whether they were willing to exchange shifts to accommodate Crider. Although prior to Crider's hire Rost and Meador had shared full responsibility for the phone between them, they told Dr. Wood that they were unwilling to resume responsibility for the phone every other weekend, indicating that it would be too burdensome since they could not travel or "disengage" from work.

Dr. Wood decided that she would not force the other two Coordinators to accept Crider's schedule and met with Crider to discuss other options. Dr. Wood asked Crider if she was willing to carry the emergency phone on the weekends if one of the other Coordinators were out of town, had a family crisis, or in the event of an emergency. Crider maintained that she would not monitor the phone on her Sabbath.[1] Crider claims that she had other suggestions for an accommodation, such as having Dr. Wood or other departmental staff monitor the phone until a fourth coordinator was hired[2] or having emergency calls forwarded to the campus police. UTK rejected these ideas on the grounds that they were unwilling to pay staff members overtime and that campus police officers were not trained to handle the matters of the PAO. As a result, UTK determined that Crider would not be able to fulfill her job duties, and on June 20, 2008, Crider was terminated.

---

[1] Crider indicates that her religious beliefs would have permitted her to assist in certain types of emergencies on the Sabbath. However, UTK claims she did not inform them of this fact. Crider says she did not inform them because they did not ask.

[2] Crider insists that during her interview Dr. Wood indicated that a position for a fourth Coordinator already existed and that she was waiting to see if they would receive the funding before it was filled. In late summer of 2008, the department received approval to hire a fourth coordinator.

No. 11-5511
*Crider v. University of Tennessee, Knoxville*

Crider filed suit alleging religious discrimination in violation of Title VII of the Civil Rights Act of 1964. UTK filed a motion for summary judgment on the basis that it could not reasonably accommodate Crider without incurring an undue hardship. The district court granted UTK's motion, and Crider now appeals.

## II.

We review a district court's grant of summary judgment *de novo*. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 894-95 (6th Cir. 2004). Summary judgment is proper where "the pleadings, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997); *see also* Fed.R.Civ.P. 56(a). The Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Blackmore*, 309 F.3d at 895.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...religion[.]" 42 U.S.C. § 2000e-2(a)(1). Short of an undue hardship on the employer's business, an employer is required to make reasonable accommodations for the religious practices of its employees. 42 U.S.C. § 2000e(j). Once an employer has offered a reasonable accommodation, it has met its duty under Title VII. *McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 609 (6th Cir. 1992). However, whether an accommodation is reasonable is determined on a case-by-case basis and

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

is generally a question of fact for a jury. *See Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987); *see also EEOC v. Bosch*, 169 F. App'x 942, 944 (6th Cir. 2006).

To establish a prima facie case of religious discrimination, a plaintiff must show that "(1) [s]he holds a sincere religious belief that conflicts with an employment requirement; (2) [s]he has informed the employer about the conflicts; and (3) [s]he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Smith*, 827 F.2d at 1085. Once the Plaintiff has established a prima facie case of discrimination, the burden then shifts to the employer to prove that it cannot reasonably accommodate the employee without incurring undue hardship. *Id.*

The parties do not dispute the district court's finding that Crider established a prima facie case of religious discrimination. The question before the Court is whether there is a genuine issue of material fact as to the reasonableness of the accommodation UTK provided Crider and UTK's ability to reasonably accommodate her without undue hardship.

*A. Reasonable Accommodation*

"The obligation to accommodate includes efforts to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs." *Id.* Reasonable accommodations for religious convictions may include unobjectionable shift exchanges, *see id.* at 1088, or a transfer to another position which preferably does not adversely affect the employee. *Draper v. Unites States Pipe and Foundry Co.,* 527 F.2d 515, 519-520 (6th Cir. 1975). While Title VII places the affirmative duty to reasonably accommodate on the employer, employees are expected to "make some effort to cooperate with an employer's attempt at accommodation." *Id.*

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

Crider asserts that upon learning of her religious conflict, UTK failed to offer her a reasonable accommodation. Crider claims to have provided UTK with several options for accommodation that did not require her to work on Friday nights or Saturdays but that UTK considered only one of her proposed ideas for a reasonable accommodation: the voluntary shift exchange. Crider maintains that UTK's rejection of her proposal and its failure to suggests its own accommodation indicates that the University did not comply with its duty to reasonably accommodate her religious needs. Moreover, Crider claims that UTK frustrated her efforts to obtain a reasonable accommodation. Crider also argues that not only did UTK not promote an atmosphere where her ideas for a reasonable accommodation would be "favorably regarded,"[3] it "affirmatively discouraged" her proposal for a voluntary shift exchange.

In response, UTK insists that it tried to reasonably accommodate her when it asked Crider if she could be flexible and agree to carry the phone on the weekends in an emergency situation or when the other two coordinators were out of town. UTK found Crider to be inflexible, uncooperative, and unwilling to strike a reasonable compromise. Although an employee is obligated to cooperate with an employer's attempt at accommodation, cooperation is not synonymous with compromise, where such compromise would be in violation of the employees' religious needs. Offering Crider fewer Saturday shifts is not a reasonable accommodation to religious beliefs which *prohibit* working on Saturdays. *See Smith v. Pyro Mining Company*, 827 F.2d 1081, 1088 (6th Cir. 1987) (holding that "where an employee sincerely believes that working on Sunday is morally wrong

---

[3] 29 C.F.R. § 1605.2(d)(i) refers to voluntary substitutions and "swaps" and encourages employers to "promote an atmosphere in which such substitutions are favorably regarded."

- 6 -

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

and that it is a sin to try to induce another to work in his stead, then an employer's attempt at accommodation that requires the employee to seek his own replacement is not reasonable.").

UTK and the district court imply that it is *Crider* who has the duty to accommodate *UTK's* needs and that ultimately *she* is the one being unreasonable. Aptly stated by the Third Circuit, a Saturday Sabbatarian's request for every Saturday off of work due to their religious needs is not *per se* unreasonable and "[t]o interpret Title VIII in this fashion would effectively remove from the statute's protection all employees who subscribe to religions with strict prohibitions against Sabbath labor." *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 134 (3d Cir. 1986) (disagreeing with the Fourth Circuit's holding in *Jordan v. North Carolina Nat'l Bank*, 565 F.2d 72 (4th Cir. 1977), that demand for every Saturday off "was so unlimited and absolute in scope...that [it] speaks its own unreasonableness and is thus beyond accommodation").

Given the foregoing, it is debatable whether UTK fulfilled its duty to reasonably accommodate Crider, and thus we turn to whether UTK is excused from this duty because providing a reasonable accommodation would create an undue hardship.

### B. Undue Hardship

UTK insists that requiring its employees to work Saturday shifts every other weekend would have created an undue hardship for Crider's former co-workers. As support, UTK cites Meador's threat to quit her job as a Coordinator if forced to carry the emergency phone every other weekend. Crider argues that her former co-workers' discontent regarding adoption of the voluntary shift exchange amounts to mere "grumbling" and is not enough to establish that UTK's business will suffer an undue hardship.

- 7 -

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

This Court has held that "objections and complaints of fellow employees, in and of themselves, do not constitute undue hardship in the conduct of an employer's business," noting that "undue hardship is something greater than hardship, and an employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine." *Draper*, 527 F.3d at 520 (internal quotation marks omitted). UTK, however, asserts that the Supreme Court in *Trans World Airlines, Inc. v. Hardison, et al.*, 432 U.S. 63 (1977), held that an accommodation causes an undue hardship where the employee's co-workers will suffer an imposition and that this holding effectively overruled our decision in *Draper*.

The district court heavily relied on *Hardison* in determining that UTK would incur an undue hardship if it were required to force Rost and Meador to resume responsibility of carrying the emergency phone every other weekend. In reaching this determination, the district court emphasized *Hardison's* rejection of the notion that an employer may deprive one employee of their shift choice in order to allow another employee to observe their Sabbath. *Hardison* held that "[t]he repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities." *Hardison*, 432 U.S. at 81. Thus, Title VII also protects Rost and Meador from discrimination on the basis of Crider's religious needs. And while the issue in *Hardison* centered around a seniority system bargained for under a collective bargaining agreement,

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

the language in *Hardison* suggests that reasonable accommodations are not reasonable when they would result in unequal treatment of employees on the basis of religion.[4] *Id*. at 84.

    Ultimately, *Hardison* hinges on the voluntary nature of a shift exchange: Had one of Hardison's co-workers been willing to forego his seniority privileges and switch shifts, there would have been no issue for the Court to decide. As it was, Hardison was not able to find a volunteer to switch shifts, and thus the Court was tasked with deciding how far TWA was required to go to reasonably accommodate Hardison without undue hardship. The Court found that requiring TWA to breach the contractual rights of its employees by abandoning the seniority system established by a collective bargaining agreement, or to replace Hardison with employees who required premium wages, went too far and created an undue hardship on TWA. *Id*. at 80, 84. As the Court explained, to require either scenario would be "[t]o require TWA to bear a more than a *de minimis* cost in order to give Hardison Saturday's off." *Id.* at 84. Title VII clearly does not require this result.

    UTK seems to twist the district court's finding and the *Hardison* decision by insisting that a significant effect on a *co-worker* will suffice to establish an undue hardship. This is an inaccurate reading of the holding in *Hardison*. Title VII does not exempt accommodation which creates undue hardship on the *employees*; it requires reasonable accommodation "without undue hardship on the conduct of *the employer's business*." 42 U.S.C. § 2000e(j) (emphasis added).

---

[4] We stop short of holding that an employee requesting religious accommodation can never be treated *differently*. The very nature of this type of accommodation requires that, where an employer operates its business on Saturdays, a Saturday Sabbatarian's accommodation will require another employee to work a Saturday shift. Thus, where an employer is able to reasonably accommodate this religious request, it is essentially treating employees differently on the basis of religion as contemplated by the Act.

- 9 -

No. 11-5511
Crider v. University of Tennessee, Knoxville

The *Hardison* Court was unwilling to deprive employees of their contractual rights under the bargained for seniority system. *Hardison*, 432 U.S. 80-81. The Court reasoned that Title VII itself provides special treatment for seniority systems, *see* 42 U.S.C. § 2000e-2(h), and thus the adoption of a neutral system, such as seniority, was protected under the Act absent discriminatory intent, despite "discriminatory consequences." *Id*. at 82. Requiring TWA to breach provisions of a collective bargaining agreement and risk the union or other employees filing suit is surely more than a *de minimis* cost. Thus, *Hardison* does not stand for the proposition that employee dissatisfaction or inconvenience alone creates an undue hardship; rather, it is the *effect* such dissatisfaction has on the employer's ability to operate its business that may alleviate the duty to accommodate.

Appellee labels our decision in *Draper* as "outdated." The Fifth Circuit seems to suggest the same in stating, "*Draper* was decided prior to *Hardison*, and thus the continuing validity of any implication in *Draper* that the employer may be required to force other employees into a disadvantageous permanent switch of shifts against their wishes is doubtful." *Eversley v. MBank Dallas*, 843 F.2d 172, 176 (5th Cir. 1988). However, the Supreme Court's decision in *Hardison* did not overrule *Draper* and it remains good law in this Circuit.

According to *Draper*, "[i]t is conceivable that employee morale problems could become so acute that they would constitute undue hardship" and that such discontent can lead to "chaotic personnel problems." *Draper*, 527 F.2d at 521. Thus, contrary to UTK's assertions, *Hardison* and *Draper* are not in conflict. Both require the employer to show an undue hardship on its business, but also recognize that an accommodation's effect on a co-worker *may* lead to an undue hardship *on the employer*.

- 10 -

No. 11-5511
*Crider v. University of Tennessee, Knoxville*

Meador's threat to quit her job as a Coordinator if forced to carry the emergency phone every other weekend does present a colorable claim of undue hardship. If Meador were to leave the department, there would only be one Coordinator available, Rost, to work on Friday nights and Saturdays. Given that Rost has already rejected the idea of working every other weekend, if he had assumed sole responsibility for the emergency phone this would have potentially caused a "chaotic personnel problem." And as we stated in *Draper*, personnel problems can lead to undue hardship on an employer. The University, however, has provided nothing to show that Meador's threat was more than mere "grumbling." As such, Crider has raised a disputed issue and summary judgment was premature.

UTK also insists that monitoring the emergency phone was not the only duty that Crider would have been unable to perform in light of her religious beliefs. UTK argues that Crider would not have been able to properly function as a Programs Abroad Coordinator because she would have been unable to attend campus outreach programs, activities at various conferences, and "site visits" that often have events on Friday nights and Saturdays. UTK submits that this would require it to send an additional Coordinator with Crider on foreign "site visits," thereby creating more than a *de minimis* cost to the school.

UTK determined that "site visits" were an essential job function of a Programs Abroad Coordinator and that it would suffer hardship if Crider remained in the position. Crider did not have the opportunity to participate in a "site visit" prior to her termination, so an accommodation for that situation was not yet necessary, but an employer may show undue hardship before an accommodation has been put into place. *See Draper*, 527 F.2d at 520; *Virts v. Consol. Freightways*

- 11 -

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

*Corp.*, 285 F.3d 508, 519 (6th Cir. 2000). However, according to Ms. Meador's deposition testimony, it is possible to "opt-out" of sessions and receptions at conferences and it is possible that events on "site visits" will not be scheduled on Friday nights and Saturdays.

Because a genuine issue of material fact exists as to the possible hardship UTK might suffer by accommodating Crider's religious beliefs, summary judgment was inappropriate.

### C. *Frustration of Accommodation*

Summary judgment is inappropriate where there is a question as to whether the employer inhibited, frustrated, or impeded volunteers from swapping shifts. *McGuire*, 956 F.2d at 610. Crider points to Meador's deposition testimony where Meador indicated that after Dr. Wood spoke with Dr. Rudolph and Chesney about the shift exchange, Dr. Wood told Meador and Rost not to do anything different at work, despite Crider's request for accommodation. Even if Dr. Wood was simply trying to assess the situation before Rost and Meador agreed, Dr. Wood's words could be construed as instructing Rost and Meador not to accept the shift exchange. Viewing the evidence in the light most favorable to Crider, we find that she has raised a genuine issue as to whether UTK frustrated, inhibited, or impeded her efforts at obtaining such an accommodation. Because a dispute of material fact remains, summary judgment was an inappropriate disposition of this issue as well.

### III.

We conclude, therefore, that the existence of genuine issues of material fact as to both the reasonableness of the accommodation UTK provided Crider and UTK's ability to reasonably accommodate her without undue hardship preclude summary judgment. Accordingly, we reverse and remand.

No. 11-5511
*Crider v. University of Tennessee, Knoxville*

**McKEAGUE, Circuit Judge, dissenting.** I would affirm the district court because, upon viewing the record in the light most favorable to Crider, the University's Programs Abroad Office was entitled to summary judgment as a matter of law. Accordingly, I respectfully dissent.

A thorough consideration of the undisputed record reveals that the University is entitled to summary judgement. The Programs Abroad Office at the University is charged with overseeing nearly 1,000 students studying abroad in approximately 35 countries. The supervisor of the Programs Abroad Office, Dr. Wood, was hired in 2007 shortly after a student studying abroad in France unexpectedly died. Recognizing that the trauma of this tragedy was amplified by faculty and University confusion over how to best react in a crisis situation, Dr. Wood implemented new emergency procedures for students and faculty abroad.

The centerpiece of the new emergency procedures was an emergency cell phone (the "emergency phone"), which created a single point of contact in an emergency. Dr. Wood assigned responsibility for the emergency phone to the Programs Abroad Office's Coordinators after determining they were the only staff members with sufficient expertise and training. At the time Dr. Wood instituted the emergency phone program in March 2008, the Programs Abroad Office had three Coordinator positions. Meador and Rost held two of the positions and the third job remained vacant until Crider was hired in May 2008.

Dr. Wood made clear that her "assumption was that the [Programs Abroad Office] would be staffed with three exempt coordinators." Indeed, she believed that "having only two Coordinators carrying the phone on an ongoing basis constituted an unacceptable risk to our students and faculty."

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

Dr. Wood anticipated that emergencies may require more than one Coordinator to resolve, thereby creating a precarious situation given the fact that the Coordinators travel frequently for work and "when one was traveling, the other had responsibility for the phone with no backup in the event of a personal emergency or family crisis." Crider does not July 19, 2012 dispute these facts.

Dr. Wood also "recognized that carrying the phone was an onerous burden to assume so frequently. Coordinators must keep the phones with them at all times, including weekends, and must remain in an environment where they can hear and respond immediately to a call." Coordinators are required to monitor the phone for seven day shifts from Monday to Monday. Moreover, Coordinators are required to stay in Knoxville while they are carrying the phone so they could access files in the Programs Abroad Office in the event of an emergency. The demands of the emergency phone thereby effectively deprived Meador and Rost of every other weekend until a third Coordinator could be found. As both Meador and Rost made clear, this was extremely burdensome, especially since they wanted to leave town on the weekends to visit family.

Given both the safety and the staffing issues resulting from having only two Coordinators to manage the emergency phone, the Programs Abroad Office continued to search for a third Coordinator. When Crider was interviewed, Dr. Wood told her that weekend work was required. At no point in the interview did Crider indicate that she would be unable to work on the weekends. Crider was offered the position and she accepted. On her fourth day as Coordinator, Crider informed the Programs Abroad Office that she was a Seventh-Day Adventist and that her religious beliefs precluded her from working on her Sabbath. Crider refused to perform any work, including participating in the emergency phone rotation, from sundown Friday to sundown Saturday.

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

For nearly one month both the Programs Abroad Office and the University explored possible means to accommodate Crider. Crider proposed an alternate emergency phone schedule that shifted her Saturday responsibilities to Meador and Rost. Dr. Wood met with Meador and Crost to ask if they were willing to accept Crider's proposal, and both Meador and Crost stated that they would not voluntarily agree to adjust shifts because it would permanently and unacceptably compromise their weekends. Dr. Wood also met with Crider and posed at least three scenarios in an attempt to accommodate her: (1) Dr. Wood asked Crider if she would be willing to carry the phone if the other Coordinators were out of town; (2) Dr. Wood asked the plaintiff if she would carry the phone if one Coordinator was out of town and the other Coordinator had a family crisis; and (3) Dr. Wood asked Crider if she would be willing to assist the other Coordinators in an emergency situation. Crider refused all three proposals. After meeting with Crider to fully explore the parameters of her religious limitations, Dr. Wood determined that Crider could not be accommodated. During this entire period, Meador and Rost continued to monitor the phone on alternating weekends just as they had prior to Crider's employment.

Under these circumstances, accommodating Crider's religious needs was an undue hardship. Title VII only requires an employer to offer employees a "reasonable accommodation" if doing so would not create an undue hardship. *See* 42 U.S.C. § 2000e(j). Title VII was not intended to force employers to "bear more than a *de minimis* cost" in accommodating employees. *Hardison*, 432 U.S. at 81. Indeed, an employer is not required to suffer a chaotic personnel problem in order to be in compliance with Title VII. *See Draper*, 527 F.3d at 520. Rather, "the mere possibility of an adverse impact on co-workers . . . is sufficient to constitute an undue hardship." *Virts v. Consol.*

- 15 -

*No. 11-5511*
*Crider v. University of Tennessee, Knoxville*

*Freightways Corp.*, 285 F.3d 508, 520-21 (6th Cir. 2002) (applying *Hardison*). Further, an employer's neutral decisions, such as shift scheduling, are protected under Title VII. *Id.* at 82. This is true even if such decisions result in "discriminatory consequences." *Id.* at 82.

There is no evidence in the record that Crider's termination was anything other than a neutral employment decision based on her inability to perform the core requirements of her position. The emergency phone rotation was instituted well before Crider was hired and the record reveals that the Programs Abroad Office viewed deviations from this program as a threat to its ability to effectively handle emergencies. Accordingly – whether Crider's accommodation is viewed from a financial or structural perspective – it would have imposed far more than a *de minimus* burden on the Programs Abroad Office. Title VII does not call for such a result. *Hardison*, 432 U.S. at 81.

The majority wrongly attributes the Programs Abroad Office's inability to accommodate Crider to employee "grumbling." The small number of qualified staff in the Programs Abroad Office meant that accommodating Crider's religious practices would have gone well beyond the "mere possibility" of adversely impacting Meador and Rost. The burden on them was not a metaphysical concern with uncertain consequences: Meador and Crost had already experienced the burdens of managing the emergency phone every other weekend for a sustained period of time and they did not want that arrangement to become permanent. As Meador and Rost emphasized, this would significantly impact their personal lives. This is legally sufficient to constitute an undue burden under Title VII. *See Virts*, 285 F.3d at 520-21.

Furthermore, the majority's approach toward Meador and Rost is disconcerting because "Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of

- 16 -

No. 11-5511
*Crider v. University of Tennessee, Knoxville*

both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities." *Hardison*, 432 U.S. at 81. If the Programs Abroad Office had forced Crider's co-workers to involuntarily assume part of Crider's emergency phone responsibilities because of Crider's religious beliefs, the effect would be discrimination against Meador and Rost in violation of Title VII. *See id.*

Finally, the majority erroneously concludes that the record contains an issue of material fact as to whether the Programs Abroad Office frustrated Crider's request for accommodation. The majority cites to *McGuire* for the proposition that "[s]ummary judgment is inappropriate when there is a question as to whether the employer inhibited, frustrated or impeded volunteers from swapping shifts." *See McGuire v. General Motors Corp.*, 956 F.2d 607 (6th Cir. 1992). In *McGuire*, however, the employee started a voluntary shift-swap scheme that "had been operating with at least some degree of success" until the employer intervened and made it "'virtually impossible'" for the scheme to continue. *Id.* at 610.

That is not the case here. First, there was no preexisting employee-generated shift-swap scheme at the Programs Abroad Office. Instead, Meador and Rost were never amenable to voluntarily giving up at least part of every other weekend — they both told Dr. Wood they were unwilling to accept such an arrangement, and Meador even threatened to quit. Second, there is no evidence that the Programs Abroad Office rendered it "virtually impossible" for Crider to obtain accommodation from her coworkers. For this point, the majority relies solely on Dr. Wood's instruction to Meador and Rost to not do anything different at work. Yet the record does not show

- 17 -

No. 11-5511
*Crider v. University of Tennessee, Knoxville*

that this instruction contributed to Meador's and Rost's decision to not accept Crider's proposed shift change (or even that it occurred prior to them informing Dr. Wood of their decision). Instead, it shows that their unwillingness to permanently sacrifice their weekends was already independently established.

In any event, any comment made by Dr. Wood was irrelevant since it was unreasonable for the Programs Abroad Office to grant Crider's proposed accommodation. The record establishes that the emergency phone program was integral to the Programs Abroad Office and Dr. Wood deemed it unsustainable to have only two coordinators handle the emergency phone program. Adding a third coordinator was one of the very reasons Crider was hired. Title VII does not require the University to make the Hobson's choice of either restructuring its entire operation or jeopardizing the well-being of its employees, students, and faculty.

The record, viewed in a light most favorable to Crider, reveals that the University met its burden. Not only did the University offer Crider multiple accommodations, but the University also demonstrated that Crider's recalcitrance would both create an undue burden for her co-workers and threaten the ability of the Program Abroad Office to handle an emergency. These are not in dispute. The record also reflects that Crider was uncooperative at every turn, thus failing to satisfy *her* burden under Title VII. *See Smith v. Pyro Mining Co.*, 827 F. 2d 1081, 1085 (6th Cir. 1987) (noting that an employee "must make some effort to cooperate with an employer's attempt at accommodation). Accordingly, the University met its Title VII burden and summary judgment is proper.

For the foregoing reasons, I respectfully dissent.